OA 91 Criminal Complaint

# United States District Court

**NORTHERN** DISTRICT OF **CAILFORNIA**

UNITED STATES OF AMERICA
V.

Saul De Los Santos VILLAFAN
Jaime CRUZ-ALVARADO

**CRIMINAL COMPLAINT**

Case Number: **08-70533 PVT**

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state that the following is true and correct to the best of my knowledge and belief. On or about **August 13, 2008** (Date) in **Santa Clara** County, in the **Northern** District of **California** defendant(s) did,

(Track Statutory Language of Offense)

aided and abetted by each other, possess with the intent to distribute at least 50 grams of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance

in violation of Title **21** United States Code, Section(s) **841(a)(1) and 18 U.S.C. section 2**

a. Minimum prison sentence - 5 years;  Maximum prison sentence - 40 years
b. Maximum fine - $2,000,000
c. Supervised release term - at least 4 years
d. Mandatory special assessment - $100
REQUESTED BAIL - NO BAIL (government will request detention); REQUESTED PROCESS - arrest warrant for each defendant

I further state that I am a(n) **DEA Special Agent Anthony J. Herrera** and that this complaint is based on the following facts:

Continued on the attached sheet and made a part hereof:  ☒ Yes  ☐ No

Approved As To Form: **Daniel Kaleba** _____
AUSA

_____
Name/Signature of Complainant

Sworn to before me and subscribed in my presence,

August 14, 2008                          at   San Jose, CA
Date                                          City and State

The Honorable Patricia V. Trumbull    U.S. Magistrate Judge    _____
Name & Title of Judicial Officer                                Signature of Judicial Officer

# AFFIDAVIT OF ANTHONY J. HERRERA IN SUPPORT OF COMPLAINT

I, Anthony J. Herrera, being duly sworn, state as follows:

1. I am a Drug Enforcement Administration (DEA) Special Agent currently assigned to the San Jose Resident Office (SJRO). As a special agent with the DEA, my investigations focus on large-scale narcotic offenders. I have been a Special Agent with the DEA since March 3, 2006. Since being employed by the DEA, I conservatively estimate that I have been involved in at least 80 drug investigations, in the arrest of over 50 drug trafficking violators, and that, on at least 40 occasions, I have been involved in searches of residences in connection with drug investigations. As a result of my training and experiences, I am familiar with how various drugs, including Crystal Methamphetamine, are used and the typical distribution and trafficking methods used by drug dealers and traffickers. I am also familiar with the various methods generally utilized by traffickers to transport drugs in and through the state of California. Based upon my personal participation in this investigation, and information provided to me by other law enforcement officers, I am familiar with the facts and circumstances referred to in this affidavit. On the basis of that familiarity, I have determined the following:[1]

2. The application for this complaint against Saul De Los Santos VILLAFAN and Jaime CRUZ-ALVARADO results from an investigation regarding the distribution of crystal methamphetamine. As discussed below, VILLAFAN negotiated proposed methamphetamine sales with an informant over a period of several months. Finally, on August 13, 2008, VILLAFAN, accompanied by Jaime CRUZ-ALVARADO met with the informant and displayed the methamphetamine. Both men were arrested. Approximately 501.3 grams (gross weight) of methamphetamine was found on the floorboard of VILLAFAN's car, below where CRUZ-ALVARADO was sitting when he was arrested. In a post-arrest interview, VILLAFAN identified CRUZ-ALVARADO as the source of the methamphetamine.

---

[1] This affidavit is a summary of pertinent information and does not contain every fact concerning this investigation known to me.

AFFIDAVIT RE: COMPLAINT

3. In or about mid-April 2008, agents from the DEA's San Jose Office were contacted by a confidential source, heretofore referred to as "CS," regarding the crystal methamphetamine trafficking activities of "Saul", later identified as Saul De Los Santos VILLAFAN, operating in the Sunnyvale, California area. VILLAFAN purported himself to be a multi-pound crystal methamphetamine trafficker to the CS. VILLAFAN told the CS that he (VILLAFAN) could supply those pounds of narcotics on only a few days notice. The CS provided "Saul's" cellular telephone number to agents. Following the submission of an administrative subpoena for the target cellular telephone, MetroPCS provided the name Saul VILLAFAN with a date of birth of February 8, 1976, and an address of 1260 West Washington Avenue, Apartment 15, Sunnyvale, CA 94086 as the subscriber for that telephone service. A query of the California Department of Motor Vehicles revealed that Saul De Los Santos VILLAFAN with date of birth February 8, 1976, had a Driver's License number of B7473539 but no photo was on file to show to the CS for a positive identification.

4. On July 3, 2008, the CS placed a monitored and recorded phone call to VILLAFAN to set up a face to face meeting to discuss future narcotics transactions. The CS and VILLAFAN agreed to meet at Garcia's Taqueria located at 738 South Fair Oaks, Sunnyvale, California. In preparation, the CS's person and vehicle were searched by agents for weapons, controlled substances, and large sums of U.S. Currency. The search met with negative results. The CS was also outfitted with a hidden radio transmitter to wear on his/her person and then surveilled to the Garcia's Taqueria.

5. Your affiant and other agents established surveillance on the parking lot of the Garcia's Taqueria in anticipation of the meeting with VILLAFAN. Agents observed the CS park his/her vehicle and get out. Agents further observed VILLAFAN approach the CS and have a conversation. Agents watched as the meeting ended and followed the CS away to another site where he was debriefed. As VILLAFAN was returning to his vehicle, Special Agent Matthew Rammes observed that VILLAFAN's blue, 2002 Chevrolet Truck, bearing California license

AFFIDAVIT RE: COMPLAINT                2

plate 8L23286, had a for sale sign on it. Special Agent Rammes approached VILLAFAN and asked about the truck and its condition. After a brief discussion regarding the truck, Special Agent Rammes walked away and VILLAFAN departed in his blue Chevrolet Truck. VILLAFAN was alone in his vehicle. It should be noted that the truck with California license 8L23286 was registered to Saul De Los Santos VILLAFAN at 1260 West Washington Avenue, Apartment 15, Sunnyvale, CA.

6. A short distance from the meet location, Sunnyvale Department of Public Safety initiated a stop for a vehicle code violation. The driver of the truck, VILLAFAN, provided to the officers the name of Saul De Los Santos VILLAFAN with a date of birth of February 8, 1976 and an address of 1260 West Washington Ave, Apartment 15, Sunnyvale, California. VILLAFAN also provided the officers with an Oregon Driver's license number of 9594477. VILLAFAN was released and not cited. Agents contacted the Portland, Oregon office to assist in providing an Oregon Driver's License photo for VILLAFAN. At DEA's San Jose Resident Office, Special Agent Rammes positively identified the driver's license photo of Saul De Los Santos VILLAFAN as the individual he spoke with regarding the truck for sale and the individual with whom agents observed speaking with the CS a short while earlier.

7. While VILLAFAN was being pulled over, the CS was being debriefed by your affiant and another agent at another location. Once at this location, the CS's person and vehicle were again searched by agents for weapons, controlled substances, and large sums of U.S. Currency. This search also met with negative results. The hidden radio transmitter was removed and the CS told the agents the following information. VILLAFAN quoted a price of $20,000.00 per pound of crystal methamphetamine. The CS asked if VILLAFAN would have any trouble supplying two to three pounds of crystal methamphetamine. VILLAFAN replied that he could supply it and only needed a few days notice to provide that quantity of crystal methamphetamine. The CS then asked what VILLAFAN would charge for smaller amounts for a possible sample purchase. VILLAFAN did not give a price and only responded that the price would go up with a

AFFIDAVIT RE: COMPLAINT                 3

smaller amount. The CS told VILLAFAN that he/she would call him (VILLAFAN) later.

8. On Wednesday, July 9, 2008, the CS contacted Special Agent Lawrence Khansmith regarding a phone call conversation with VILLAFAN that the CS had just recently ended. VILLAFAN had told the CS that he (VILLAFAN) had two pounds in his possession and that the CS could come by that night to purchase it. The CS pushed VILLAFAN off for the following week because the amount wasn't enough.

9. On Thursday, July 10, 2008, the CS again made contact with Special Agent Lawrence Khansmith and told him that VILLAFAN wanted to meet the CS at the Hip Huggers Bar at 948 El Camino Real, Sunnyvale, California to discuss the amounts. Agents approved the meeting without surveillance as long as the meeting was in public. After the meeting was over, the CS contacted your affiant to let me know that he/she was ok and what came about during the meeting. The CS relayed the following information regarding the meeting to your affiant. The CS told VILLAFAN that he/she wanted to purchase six pounds of crystal methamphetamine. VILLAFAN told the CS that his (VILLAFAN's) source didn't trust that the CS could come up with the money to pay for all six pounds and that the most that the source would let go on the first purchase would be three pounds of crystal methamphetamine. If the CS could pay for that amount, the source would consider selling the CS larger quantities in the future. VILLAFAN also told the CS that for the deal to happen, he (VILLAFAN) would need to see the money first before bringing the drugs. The CS told VILLAFAN that would be fine and then asked how long it would take from the time he/she showed VILLAFAN the money to the time the crystal methamphetamine would arrive. VILLAFAN responded that the source lived a few blocks north of him (VILLAFAN) and would only take a short while. They set a meeting time for the following Wednesday after VILLAFAN gets off of work at approximately 5:30 PM at the Chevron located at the corner of West El Camino Real and South Mary Avenue in Sunnyvale, California.

10. On Wednesday, July 16, 2008, agents met with the CS before the proposed

AFFIDAVIT RE: COMPLAINT                 4

purchase was to take place. In preparation, the CS's person and vehicle were searched by agents for weapons, controlled substances, and large sums of U.S. Currency. The search again met with negative results. The CS was also outfitted with a hidden radio transmitter to wear on his/ her person. He/She was then surveilled to the Longs Drugs located at 1165 West El Camino Real, Sunnyvale where agents had already established surveillance. Agents had also established surveillance at VILLAFAN's residence at 1260 West Washington Avenue, Sunnyvale. The CS was directed to call VILLAFAN to tell him that there was a Sunnyvale Police Officer sitting in the parking lot of the Chevron and that he/ she was waiting for VILLAFAN at the Longs Drugs a short way down the street. The CS's side of the phone conversation was recorded via the hidden transmitter.

11. A short while later, agents observed a white Volvo sedan bearing California license plate 5XJJ939 and registered to Saul De Los Santos VILLAFAN at 1260 West Washington Avenue, Sunnyvale, arrive and park nearby the CS's vehicle. VILLAFAN exited the Volvo which remained occupied by what appeared to be an adult female in the front passenger seat and a juvenile female in the rear seat. The conversation between VILLAFAN and the CS was recorded and is maintained as evidence. In summary, VILLAFAN told the CS that the source had five pounds of crystal methamphetamine and sold them all earlier that morning. VILLAFAN was observed talking on his cellular phone and from the partial conversation heard and recorded, it appeared that he called his source to see if there were any narcotics available that afternoon. At this point, the CS made a call on his/ her cell phone to your affiant to signal that he/ she was ready for the money to arrive.

12. Special Agent Jesus Alvarez, acting in an undercover capacity, arrived to the meet location with $40,000.00 of DEA funds for the purpose of showing VILLAFAN that he and the CS were ready and capable of paying for the crystal methamphetamine. The $40,000.00 was packaged in a manner that VILLAFAN could see the money but would not be able to easily count the exact amount. VILLAFAN and Special Agent Alvarez spoke for a short while and showed

AFFIDAVIT RE: COMPLAINT                    5

1  VILLAFAN the money. VILLAFAN told SA Alvarez that he would call when the, "old man"
2  called him back. Shortly there after, the agent departed with the money and the display of the
3  money was complete. VILLAFAN was then observed on his phone and from the portion that
4  was heard and recorded, it appeared that he received a call from his source. Again, VILLAFAN
5  told the CS that there was no crystal methamphetamine to sell that day. The meeting ended and
6  VILLAFAN and the CS were observed returning to their respective vehicles and departing the
7  area.
8         13.    While the CS was observed departing the meeting site, surveillance was
9  maintained on VILLAFAN's residence. VILLAFAN was observed parking his Volvo near his
10 residence where he exited and began speaking with an older Hispanic male in an animated
11 fashion. Surveillance units observed the older Hispanic male eventually enter and depart the area
12 in a black Nissan Altima bearing California license plate 5YWW329 and registered to an
13 individual at 1289 Ayala Drive, Apartment 3, Sunnyvale, California. It should be noted that
14 1289 Ayala Drive is located three streets north of VILLAFAN's residence on Washington
15 Avenue.
16        14.    After the above-described meeting, the CS's person and vehicle were again
17 searched by agents for weapons, controlled substances, and large sums of U.S. Currency. This
18 search also met with negative results. The hidden radio transmitter was removed and the CS was
19 debriefed. The CS relayed to agents the same information that was heard via the hidden
20 transmitter regarding the source of supply selling the crystal methamphetamine to someone else
21 earlier in the day.
22        15.    On Monday, August 8, 2008, the CS contacted Special Agent Khansmith and
23 relayed that he/ she spoke with VILLAFAN. VILLAFAN said that his sources of supply were
24 unwilling to come to Sunnyvale, California from Modesto, California because of the distance but
25 they had recently changed their minds and that they were willing to sell him (VILLAFAN) the
26 three pounds of crystal methamphetamine that the CS had originally asked for. The CS was
27
28 AFFIDAVIT RE: COMPLAINT                 6


directed to call VILLAFAN to tell him that the CS and his/ her cousin would be available to make the purchase on Wednesday morning.

16.     On Wednesday, August 13, 2008, agents of DEA's San Jose Resident Office along with officers from the Sunnyvale Department of Public Safety set up surveillance in the vicinity of the Longs Drugs located at 1165 West El Camino Real, Sunnyvale and VILLAFAN's residence. At an off site location, the CS's person and vehicle were searched by agents for weapons, controlled substances, and large sums of U.S. Currency. The search met with negative results. The CS was also outfitted with a hidden radio transmitter to wear on his/ her person and then surveilled to the Longs Drugs. Surveillance at the Longs Drugs relayed that VILLAFAN was already parked and waiting for the CS. The CS parked next to VILLAFAN and the two began talking. A recording was made from the conversation via the hidden transmitter. A summary of the conversation is as follows: VILLAFAN's source did not want to do the deal outside in plain view and wanted to do the deal at VILLAFAN's residence. The CS refused stating that his/ her cousin would not agree to bring the money to pay for the narcotics to VILLAFAN's residence. The CS told VILLAFAN that the only possible way the deal would be done at the residence is if VILLAFAN or the source would come out to the CS's vehicle to show him/ her the crystal methamphetamine. VILLAFAN told the CS that the crystal methamphetamine was actually still on it's way to Sunnyvale from Modesto and that it would be coming in two cars for the sake of security. VILLAFAN said that it was almost to Sunnyvale. The CS said that he/ she would have to speak with his/ her cousin in person to talk about the deal. In the event that the CS's cousin agreed to do the deal at VILLAFAN's residence, VILLAFAN told CS to follow him (VILLAFAN) to his (VILLAFAN's) residence so that the CS would know where he (VILLAFAN) lived. At this time, the two departed in their respective vehicles and were observed to drive past 1260 West Washington Avenue. VILLAFAN called the CS and told him/ her that when they returned, to just call VILLAFAN and that he would come out to get him/ her. VILLAFAN parked nearby on the curb of West Washington and walked to

AFFIDAVIT RE: COMPLAINT                    7

his residence. He was observed shortly there after walking around in front of the building looking up and down West Washington Avenue as if anticipating someone's arrival. VILLAFAN eventually walked in the direction of his residence.

17. The CS was surveilled back to another location where he/ she met with agents. Agents directed the CS that for his/ her safety, the deal would not be done indoors, away from where surveillance could observe. At this location, the CS received a phone call from VILLAFAN telling the CS that the source from Modesto was a few minutes away from VILLAFAN's residence. A few minutes later, surveillance units at the residence observed a black 2005 Nissan Altima bearing California license plate 5XVN896 and registered to an individual at 1127 South Baker, Santa Ana, California enter the parking area to the east of 1260 West Washington Avenue. Surveillance observed that the vehicle that entered was occupied by two Hispanic males.

18. From the off-site location, agents surveilled the CS once again drive to the Long's Drugs. At the direction of agents, the CS placed a phone call to VILLAFAN saying that his/ her cousin would absolutely not do the deal at VILLAFAN's residence. The CS told VILLAFAN that if the source did not bring out all three pounds of crystal methamphetamine for the CS to see it, that they would just call off the deal and the source would have to drive back to Modesto with no money. The CS effectively called off the deal. The call ended and a few minutes later, the CS received and incoming call from VILLAFAN. VILLAFAN said that he and his source would be on their way to the Long's Drugs shortly with one pound of narcotics. At approximately the same time, surveillance units at VILLAFAN's residence observed him (VILLAFAN) driving his Volvo with a single passenger, later identified as Jaime CRUZ-ALVARADO. The remaining Hispanic male driving the black Nissan Altima was observed following closely behind. Surveillance observed the two vehicles drive in tandem south down South Bernardo and turn east on El Camino Real. The two vehicles finally split up when VILLAFAN and CRUZ-ALVARADO in the white Volvo made a U-turn to come into the Long's Drugs parking lot and

AFFIDAVIT RE: COMPLAINT                 8

1  the black Altima continued eastbound on El Camino Real. Surveillance was lost on the black
2  Nissan Altima at this time.

3      19.    Once in the lot, approximately 12:46 PM, VILLAFAN parked his Volvo next to
4  the CS's vehicle. The CS was observed exiting and talking near the passenger side of
5  VILLAFAN's vehicle. Still fitted with the hidden transmitter, the CS was heard telling
6  VILLAFAN and CRUZ-ALVARADO that his/ her cousin had the money. VILLAFAN asked
7  the CS if he/ she would pick up the remaining two at VILLAFAN's residence. The CS told
8  VILLAFAN that he/ she would after he/ she saw the pound that they brought. The CS asked to
9  see and smell the crystal methamphetamine. The CS was heard telling VILLAFAN that the
10 "stuff" looked good. With that, the CS gave the prearranged signal to your affiant to confirm the
11 arrival of the narcotics. Your affiant relayed the bust signal to the arrest teams and VILLAFAN
12 and CRUZ-ALVARADO were taken into custody without incident. The Volvo was searched
13 incident to VILLAFAN's arrest. On the passenger floorboard of the white Volvo, below where
14 CRUZ-ALVARADO was sitting when he was arrested, the agents found a blue gift bag
15 containing a dense, cellophane wrapped mass.

16     20.    The CS's person and vehicle were again searched by agents for weapons,
17 controlled substances, and large sums of U.S. Currency. This search also met with negative
18 results. The hidden radio transmitter was removed and the CS was transported to another
19 location where he/ she was debriefed. During the debriefing, the CS confirmed all that was heard
20 and recorded over the transmitter. The CS also clarified that CRUZ-ALVARADO had the bag
21 containing the narcotics between his legs in the passenger seat. When the CS asked to see and
22 smell the narcotics, it was CRUZ-ALVARADO who held up the bag for the CS to look and
23 smell into. At no time did the CS observe VILLAFAN take possession of the bag containing the
24 narcotics.

25     21.    Once taken into custody, VILLAFAN and CRUZ-ALVARADO were transported
26 and processed at the Sunnyvale Department of Public Safety. After initial processing, the two
27
28 AFFIDAVIT RE: COMPLAINT                9

were interviewed individually. While the two were processed, the suspected crystal methamphetamine was examined. The cellophane was removed revealing a white crystalline substance contained within a zip top bag that was further contained in another zip top bag. The substance was field tested. The field test provided a positive result for the presence of methamphetamine. The weight of the suspected crystal methamphetamine and packaging was measured as 501.3 grams (gross weight).

22.  At approximately 2:42 PM, your affiant and other agents began the interview of Saul VILLAFAN. The interview began with Special Agent Jesus Alvarez reading him (VILLAFAN) his Miranda warnings in Spanish. VILLAFAN indicated that he understood his rights and was willing to answer some questions. VILLAFAN told agents that he only knows his source (CRUZ-ALVARADO) as "El Pinguino" or the Penguin. VILLAFAN said that he had met CRUZ-ALVARADO only about fifteen days earlier at the Chavez Supermarket in Sunnyvale. The meeting was set up by a mutual friend named "Chava" at VILLAFAN's work. VILLAFAN told agents that CRUZ-ALVARADO was going to sell the methamphetamine to VILLAFAN at $20,000 per pound. VILLAFAN was planning to sell the methamphetamine to the CS at $22,000 per pound. VILLAFAN also told agents that he had never met the other individual from the black Nissan Altima before. That second individual stayed outside in the car when they arrived at VILLAFAN's residence. CRUZ-ALVARADO came inside for a short time. VILLAFAN claims that CRUZ-ALVARADO told him (VILLAFAN) that the source was coming from Modesto. VILLAFAN never saw the remaining two pounds of methamphetamine but suspected that they were nearby and possibly with the unknown male driving the black Nissan Altima. VILLAFAN also claims that he never saw the one pound that agents did recover. At this time agents ended the interview.

23.  At approximately 3:15 PM, the interview of Jaime CRUZ-ALVARADO began with Special Agent Jesus Alvarez reading him (VILLAFAN) his Miranda warnings in Spanish. CRUZ-ALVARADO indicated that he understood his rights and was willing to answer some

AFFIDAVIT RE: COMPLAINT                                10

1  questions. When asked about his criminal history, CRUZ-ALVARADO told agents that he's
2  been arrested in Mountain View, California for crashing into a fence with his car. He said that
3  he'd never been arrested for drugs. CRUZ-ALVARADO claimed to agents that he didn't know
4  what was going on. He said that he'd only known VILLAFAN for about a week. He also
5  claimed that he was just there in the passenger seat talking with VILLAFAN and that there was
6  another person talking to VILLAFAN. Agents believed that CRUZ-ALVARADO was being
7  untruthful so the interview was ended.

8     24.   Based on the foregoing, I believe that there is probable cause to believe that Saul
9  De Los Santos VILLAFAN and Jaime CRUZ-ALVARADO are each guilty of a violation of Title
10 21, United States Code, Section 841(a)(1) (possessing with intent to distribute Crystal
11 Methamphetamine) and Title 18, United States Code, Section 2 (aiding and abetting). I
12 therefore request the issuance of a criminal complaint against Saul De Los Santos VILLAFAN
13 and Jaime CRUZ-ALVARADO for this offense.

_____
Anthony J. Herrera, Special Agent
Drug Enforcement Administration

Sworn to and subscribed before
me this 14th day of August 2008.

_____
The Honorable Patricia V. Trumbull
U.S. Magistrate Judge

28  AFFIDAVIT RE: COMPLAINT                11